Filed 8/1/25  P. v. Lu CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B337815 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA495163 |
| v. | |
| STEVEN LU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa Lench, Judge.  Affirmed.

Andrea Keith, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

————————————————

Defendant Steven Lu appeals from his conviction by a jury on September 13, 2023, of two counts of grand theft from an elder or dependent adult, in violation of Penal Code section 368, subdivision (d), a felony. We affirm.

## Overview

Defendant was a relationship banker at a JP Morgan Chase branch bank in Los Angeles County. He met the victim, Marion Poulter, an elderly woman in her 80's, for the first time on March 17, 2018, when she came into the bank where he worked. On March 20, 2018, Ms. Poulter wrote a check to defendant for $25,000, with the memo notation, "Thanks for your help." On March 30, 2018, she wrote another check to defendant for $15,000. By April 5, 2018, Ms. Poulter had signed trust documents under which defendant was a 75 percent beneficiary, a durable power of attorney for healthcare in favor of defendant, and a durable power of attorney for asset management in favor of defendant.

## The Testimony

The jury trial took place over nine days between August 30 and September 13, 2023.

Tiffanie Bell was vice president and branch manager of the Chase branch in Altadena where defendant worked. There was a Bank of America financial center 20 steps away, where Ms. Poulter had multiple accounts. Ms. Bell received training about twice a year in identifying elderly people who might be susceptible to fraud or financial abuse, and was a "mandatory reporter" of suspected abuse (as was defendant).

On March 17, 2018, Ms. Bell observed Ms. Poulter sitting at defendant's desk with a big stack of paperwork; she was there for about three hours, an unusual amount of time. Defendant told Ms. Bell that Ms. Poulter was confused about her accounts, and needed assistance with understanding what was going on

with her accounts. Defendant wanted to open an account for her and bring over $700,000 to Chase. Ms. Bell refused to let defendant open an account for Ms. Poulter. At some later date, Ms. Bell became concerned when she observed defendant talking to Dominick Divine, a financial advisor at the branch, about opening an account for someone in the same dollar amount. She spoke to Mr. Divine and understood defendant was trying to set up an investment account for a family friend. Ms. Bell was concerned that defendant was acting unethically. After speaking with other bank employees about defendant's attempts to open a new account, Ms. Bell reported defendant to the bank's investigations team. The investigations team interviewed defendant by telephone that same day, and after the interview, defendant resigned.

As stated at the outset, Ms. Poulter signed the documents creating her living trust on April 5, 2018. The documents were prepared by defense witness James Helms, an estate planning lawyer who had retired by the time of trial. Defendant made the appointment with Mr. Helms for the estate planning documents. Mr. Helms met with Ms. Poulter several times. He testified there were warning signs about defendant, but Ms. Poulter did not seem confused or unable to understand. Mr. Helms concluded she and defendant were true friends.

Thomas Hoffman is an estate planning attorney who met alone with Ms. Poulter on April 11, 2018, for at least an hour or two. Attorney Helms had referred Ms. Poulter to Mr. Hoffman for purposes of providing a certificate of independent review, which is intended to determine whether the disposition in an estate planning document is the result of fraud, duress or undue influence. Mr. Hoffman did not sign the certificate, as he was uncomfortable with offering an opinion as to Ms. Poulter's susceptibility to fraud, duress or undue influence.

Dominick Divine testified, confirming Ms. Bell's description of their encounter about opening an investment account for a family friend, Ms. Poulter. Mr. Divine said he would have to meet with Ms. Poulter. They set up a meeting for a Saturday, but when defendant brought Ms. Poulter to the bank, Ms. Bell would not let them in and they left.

Ahmad Mehaidly was a private client banker at Chase's main office in Pasadena, where defendant had worked before his transfer to the Altadena branch. Defendant contacted Mr. Mehaidly in early April to open a trust account, for which defendant would be trustee, for his family friend, Ms. Poulter. Defendant emailed Mr. Mehaidly the trust documents, and they met, along with Ms. Poulter, on April 12, 2018. At the meeting, defendant brought an addendum Mr. Mehaidly had not seen before, which showed defendant as a beneficiary of the living trust. Mr. Mehaidly spoke to Ms. Poulter alone and questioned her about how she knew defendant; she gave inconsistent answers and said she was making defendant a beneficiary "because he takes care of her." Mr. Mehaidly did not open an account; he consulted with the Pasadena branch manager, Benny Sanchez, who told defendant they would not open an account. Among the "red flags" were the discrepancy in how defendant and Ms. Poulter knew each other and "being beneficiary getting a big chunk of her nest egg." Mr. Mehaidly raised the topic of making a report of potential elder abuse with his manager, but his superiors were already reporting the incident.

Veronica Mendoza was assistant manager at the Bank of America branch in Altadena, located near the Chase branch. Ms. Poulter was a frequent client, coming in several times a week, and had multiple accounts. Defendant came in with Ms. Poulter in March 2018, asking to close out her accounts, and wanted cash. The branch didn't have that amount of cash on

4

hand (over $200,000) "at the moment." Defendant spoke for Ms. Poulter (a red flag), and when Ms. Mendoza asked to speak to Ms. Poulter privately, "he refused to allow her to do so." Ms. Mendoza insisted; she testified Ms. Poulter "was a little confused," and "wasn't sure why she was closing out the accounts," and defendant had instructed her to do so. Then defendant "barges into the office and says that the conversation was over." They exchanged words; Ms. Mendoza asked an associate to call the police, who arrived and spoke to defendant and Ms. Poulter, who were allowed to leave. Ms. Mendoza reported the incident, and several days later the accounts were closed.

Jason Jones, a detective in the county sheriff's fraud and cybercrimes bureau, received a suspected elder abuse report made by a bank employee concerning Ms. Poulter and defendant dated April 13, 2018. Detective Jones collected multiple such reports from Adult Protectives Services as part of his investigation. He interviewed Ms. Poulter on September 19, 2018. This was recorded and played for jury. Detective Jones testified it was clear she had some mental impairments. She could not remember details about things he expected her to know; "didn't seem to have much of a grasp as far as her finances go"; and couldn't remember meeting defendant at Chase Bank or the name of the bank.

Detective Jones testified he subpoenaed various bank records. The $25,000 and $15,000 checks to defendant drawn on one of Ms. Poulter's accounts were deposited into defendant's bank account at the Bank of America. On April 11, 2018, hundreds of thousands of dollars from accounts at another institution were transferred to new accounts opened at Wells Fargo; the account holders were Ms. Poulter's living trust and defendant.

5

Elizabeth Torres Jaquez was a probate court investigator. In January 2019, defendant was seeking to be conservator over both the person and estate of Ms. Poulter. Ms. Jaquez interviewed Ms. Poulter. She concluded Ms. Poulter needed a conservator, but was concerned about appointing defendant. Eventually, Ms. Poulter's sister was appointed temporary conservator, and Ms. Jaquez recommended that a third non-related professional conservator be appointed.

Tamiel Holloway, a probate and special education attorney, was appointed in January 2019 to represent Ms. Poulter in the investigation of the proposed conservatorship. Ms. Holloway met with Ms. Poulter on January 10, 2019. Ms. Poulter could not recall where all her money was. Ms. Holloway reviewed Ms. Poulter's estate planning documents, including the durable power of attorney for asset management designating defendant as her agent. In her January 2019 report to the court, Ms. Holloway recommended the court should suspend the testamentary document, refer the case to the Public Guardian's office, and consider the appointment of a professional financial fiduciary. In early February 2019, Ms. Holloway received several confused calls from Ms. Poulter, and "[i]t wasn't clear she knew how to operate the phone."

Ms. Holloway was interviewed by Detective Jones, and provided him with the estate planning documents, as well as copies of the $25,000 check and the $15,000 check made out to defendant from Ms. Poulter. The check copies had been given to her by defendant's then-counsel.
She made a report to Adult Protective Services because "some of the activity looks like it could be suspicious."

Dr. Diane Homeier is an experienced geriatrician who also ran an elder abuse forensic center. Both Adult Protective Services and the Public Guardian had concerns about

Ms. Poulter's ability to make financial decisions for herself. Dr. Homeier performed an evaluation and conducted cognitive testing of Ms. Poulter on February 20, 2019. Dr. Homeier also reviewed Ms. Poulter's Kaiser medical records from 2017 to 2019, as well as reports from Adult Protective Services. Dr. Homeier noted that Ms. Poulter had "admitted to some memory issues" in October 2017. In September 2018, she admitted having more and more trouble with her memory, and in October 2018, a comprehensive memory evaluation was done at Kaiser. Her scores were in the moderate to severe range of cognitive deficits; the Kaiser notes indicated a diagnosis of dementia most likely due to Alzheimer's disease.

After performing her own assessment and reviewing the records, it was Dr. Homeier's opinion that Ms. Poulter certainly had a dementia syndrome and lacked capacity at the time of her February 2019 evaluation, and "she probably lacked financial capacity as early as December of 2017." (This was when Ms. Poulter was the victim of a scam involving her writing several checks totally $50,000 for repair of her driveway.)

The defense presented many witnesses in addition to James Helms, who prepared the trust documents (see *ante,* at page 3). Eugene Alkana was an estate planning attorney who executed a certificate of independent review after Mr. Hoffman declined to do so. He met Ms. Poulter twice, and signed on May 21, 2018. He recalled virtually nothing about it, and testified to what he would have done. Connie Kwok, a personal banker at Citibank, opened a trust account for Ms. Poulter in January 2019. She noticed no red flags and could not recall if Ms. Poulter answered her questions. Maria Klahejian was a premier banker at Wells Fargo in April 2018, and opened the accounts there for Ms. Poulter and defendant, but had no independent recollection of doing so. Kevin Mehserejian was a senior financial advisor at

7

Wells Fargo who worked with Ms. Klahejian when the accounts were opened; he recalled setting up the investment account for defendant and Ms. Poulter and meeting with them twice, and saw nothing that caused him concern.

Junell Mackey was a certified public accountant who prepared tax returns for Ms. Poulter for over thirty years; the last return was for the year 2020. She did not see a decline in Ms. Poulter's memory until the year before she died. Ms. Poulter appeared to understand why she was in Ms. Mackey's office and was "quite coherent." Ms. Mackey told Detective Jones that she noticed at a meeting with Ms. Poulter that she was failing mentally, but the date of that meeting is unclear.

Deputy District Attorney Lisa Daruty was prosecuting cases involving vulnerable victims in 2018. This included the elder abuse case involving the $50,000 sidewalk scam. Ms. Daruty conducted a preliminary hearing on August 27, 2018, at which Ms. Poulter testified. Ms. Daruty was comfortable calling her as a witness; Ms. Poulter appeared to understand some of the questions and not to understand others. Ms. Poulter was "kind of confused" and sometimes didn't understand the question so that Ms. Daruty would have to ask it a different way and ask leading questions, but "overall I got what I needed from her."

**The verdict and sentencing**

On September 13, 2023, the jury convicted defendant on both counts of grand theft of an elder person. Defendant waived his right to a jury trial on aggravating factors that were alleged in the information.

On October 18, 2023, defendant petitioned for release of juror information so that he could investigate "potential juror misconduct." This was based on declarations from defendant's wife, Vivian Lu, and from George Lu, stating that on the last day of trial, while waiting in line at the cafeteria, they overheard an

8

exchange between a juror and a cafeteria employee; the juror allegedly thanked the employee for her kindness, "since I won't be seeing you again. This will end quickly."

At the sentencing hearing on December 19, 2023, the court denied defendant's petition to release juror information, ruling there was nothing to support defendant's suggestion that the jurors were discussing the matter among themselves before deliberations began.

The court found circumstances in aggravation (the victim was particularly vulnerable; the crime involved a taking of great monetary value; defendant took advantage of a position of trust; and the manner in which the crime was carried out involved planning). (Cal. Rules of Court, rule 4.421(a)(3), (9), (11) & 8.) Circumstances in mitigation included no previous criminal record; "collateral consequences to a custodial sentence in terms of his family"; and many community ties and supportive friends and family.

The court suspended imposition of sentence, placed defendant on probation for two years, required him to perform 500 hours of community service, ordered restitution to the estate of Ms. Poulter of $40,000 plus 10 percent interest, and assessed various other fees.

## The Appeal

We appointed appellate counsel to represent defendant. Appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) in which no issues were raised. The brief included a declaration from counsel that she reviewed the entire record and sent a letter to defendant explaining her evaluation of the record. Counsel further declared she advised defendant of his right to submit a supplemental brief within 30 days, and that she sent defendant a copy of the record on appeal and a copy of her brief. Defendant did not file a supplemental brief.

We have examined the entire record and are satisfied that appointed counsel fully complied with her responsibilities and that no arguable issues exist.  (*People v. Kelly* (2006) 40 Cal.4th 106, 109-110; *Wende, supra,* 25 Cal.3d at p. 441.)

## DISPOSITION

The judgment of conviction is affirmed.

RUBIN, J.*

WE CONCUR:

STRATTON, P. J.

VIRAMONTES, J.

_____

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.